[Crim. No. 4148. In Bank.—April 28, 1938.]

THE PEOPLE, Respondent, v. FRANCISCO AGUIRRE, Appellant.

C. W. Benshoof and Thomas Clay for Appellant.

U. S. Webb, Attorney-General, W. F. Cleary, Deputy Attorney-General, and Earl Redwine, District Attorney, Riverside County, for Respondent.

SHENK, J.—This is an appeal from a judgment imposing the death penalty and from an order denying a motion for a new trial.

On Sunday, July 25, 1937, at 8:30 P. M., the defendant, a Mexican, 29 years of age, killed Gabriel Contreras, also a Mexican, 38 years of age, by shooting him in the head with a revolver. The homicide occurred at the ranch home of the deceased located in a sparsely settled section of the desert country about three miles from the town of Thermal in the

Coachella Valley. The deceased was living at his ranch place with his four children, the oldest being twelve years of age, and with the mother of his children, Pilar Gonzales, also known as Pilar Contreras. The deceased and Pilar had lived together as husband and wife since 1925, although no civil marriage ceremony had been performed.

The deceased had moved with his family from Oasis to the ranch near Thermal about one year before the homicide. Shortly thereafter the defendant stopped at that ranch in search of a place to live, whereupon arrangements were made under which the defendant was to live with the deceased and his family while he worked for the deceased or in the vicinity. The defendant agreed to the payment of $3 a week for his room and board. After the defendant had lived at the Contreras home about eight months he left at the request of Contreras and went to live on the property of Fabian Salgado located about a third of a mile from the Contreras place. The defendant there lived in a habitation which he constructed for himself in the brush near the house of Salgado at whose place he ate his meals. The defendant was living on the Salgado place on July 25, 1937, the date of the homicide.

Not long after the defendant moved into the home of the deceased he established an intimate relationship with Pilar, or Mrs. Contreras, as the mother of deceased's children was generally known. This intimacy was carried on at the home of the deceased commencing in January, 1937, and ending on the Friday before the Sunday of the homicide. In March Mrs. Contreras notified the defendant that she was pregnant. The defendant acknowledged responsibility for the woman's condition. When she was about five months' pregnant he expressed to a near-by rancher his pleasure at the prospect of having offspring and planned with Mrs. Contreras to leave the home and children of the deceased and to depart for Arizona.

During the time that the defendant was living at the deceased's place the defendant occasionally went to Indio with Salgado in the latter's truck and there purchased provisions for the deceased, which provisions were hauled in that truck to the deceased's home. On the late afternoon of the day of the homicide the defendant went to the deceased's place and told the deceased that it would be only just and right that he, the deceased, should pay Salgado for hauling provisions

from Indio to the Contreras house. The defendant did this on his own initiative, for Salgado had not requested or suggested that he do so, nor had Salgado ever claimed that any compensation was due him for such hauling. No reason appears why the defendant should have made such a request or demand on the deceased for such payment, except, as urged by the prosecution, that the defendant was looking for trouble. At any rate, trouble ensued. During the argument the deceased disclaimed any indebtedness to Salgado and upbraided the defendant with epithets for making such a claim, even going to the extent of chasing the defendant and striking him with a corn knife or machete, without however, causing any serious injuries. The defendant made his retreat by outrunning the deceased and went to the home of Salgado apparently for the purpose of arming himself for a return engagement with the deceased. In the house of Salgado the defendant first armed himself with a butcher knife. Salgado evidently knew or surmised the defendant's purpose in thus arming himself, for Salgado immediately took the knife away from the defendant.

The defendant then repaired to the farmhouse of the Leach family about a quarter of a mile from Salgado's place. He approached Herbert Leach, a young man about 24 years of age, and told him that Fabian Salgado sent him over to borrow a pistol and flashlight to watch for coyotes the next morning. This statement by the defendant to Herbert Leach was not true, for Salgado had not made such a request. Nevertheless Leach delivered to the defendant the pistol, with holster and ammunition, and the flashlight. Whereupon the defendant returned to the Contreras place and took a position on the bank of a large reservoir at a point about sixty-six feet from the Contreras house. At that place the defendant waited for Contreras to come out of the house, and was prepared to wait there all night, if necessary, in order to see Contreras. He testified that he returned to the Contreras place to see if everything was ''peaceful'', but that if Contreras ''was going to fight with me, we were going to fight''. Earlier in the evening Contreras had gone to bed in the house, clothed in shorts only. There were no toilet facilities in the house. At 8:30 o'clock that night he arose and went out of the house and proceeded toward a small reservoir. When he was from fifteen to twenty feet from

the defendant, the defendant fired two shots from the revolver which he had obtained from Leach. One of those shots struck Contreras full in the face, just beneath his nose, and after penetrating the head severed the spinal cord. Contreras fell and died immediately. There was no living witness of the event except the defendant. After the killing the defendant proceeded to the home of Salgado, entered the house alone, concealed the gun and holster, cartridge belt and flashlight under the mattress of Salgado's bed, and departed. He went to the railroad track and traveled eastward with his intended destination Jerome, Arizona, where he had some relatives. Two days later he was apprehended at the town of Niland by a deputy sheriff of Riverside County. Upon his arrest the defendant at once admitted that he had shot Contreras and had seen him fall at about the place where the body was found.

The defendant contends on this appeal that the evidence was insufficient to establish the crime of murder in that there was no showing of malice or wilful, deliberate or premeditated killing. With this contention we cannot agree. There was sufficient evidence of ill will between the two men. The evidence of the illicit relationship between the defendant and Mrs. Contreras and their purpose to go to Arizona as soon as the defendant could obtain adequate funds, was a disclosure of facts from which the jury could imply motive. It is true that the defendant testified that the deceased was the aggressor and pursued him with a machete when he emerged from his house at 8:30 on the night of the killing; that he, the defendant, attempted to flee while being pursued by the deceased wielding the machete, but was unable this time to outstrip the deceased and shot only in his own defense. But the jury was not bound to believe his testimony in this regard, especially in the light of the evidence of his statements to Officer Vivian shortly after his arrest that "I didn't run at all. That is the truth." The many contradictory statements of the defendant as to why he returned to the Contreras place, and the facts and circumstances attending the affair and related by other witnesses placed with the jurors the power and responsibility of selecting the evidence which, in their judgment, conformed to the truth. We do not feel justified in disturbing their conclusions impliedly expressed by their verdict that the defendant desired

to possess and take away the putative wife of the deceased; that ill will was engendered between the deceased and himself, at his instigation and without sufficient cause, on the afternoon of July 25th; that with evil purpose and deliberation he attempted openly but without success to arm himself with a butcher knife at the home of Salgado; that by cunning, misrepresentation and falsehood he later obtained the lethal weapon from Herbert Leach; that he then and after nightfall returned to the house of the deceased and there, at a convenient place, lay in wait for his victim, with the expressed intention of waiting all night if necessary to accomplish his purpose, and that the evidence in support of the defendant's plea of self-defense was not so conclusive under all the circumstances as to preclude a denial of the plea.

■ The defendant complains of certain portions of instruction number 12. Particularly it is contended that error appears in the following language included in said instruction on self-defense: "In the effort to save his own [life], or to avoid the infliction of great bodily injury upon him, the person in danger, real or apparently real, may use so much force as is necessary to meet such danger and no more. If he goes beyond this limit, he transcends the law of self-defense, and becomes himself a wrongdoer." It is claimed that such language requires the defendant at his peril to determine the amount of force necessary to meet the danger. The contention is that the instruction is fatal because it did not include the italicized words in the following sentence: "may use so much force as *to the mind of a reasonable person,* is necessary to meet such danger and no more". The instructions might well have included the phrase which the defendant claims should have been included; but its omission did not constitute prejudicial error, when the balance of the instruction is taken into consideration, wherein it was very plainly indicated to the jury that the action of the defendant, on his plea of self-defense, should be tested by what a reasonable man would do under like circumstances.

■ Instruction number thirteen on the subject of self-defense, is also criticized, not as a misstatement of the law, but as not applicable to the facts in this case. This instruction told the jury that whenever an assault is brought upon a person by his own procurement, or under an appearance of hostility which he himself creates, with a view of having his

adversary act upon it, and he so acts and is killed, the plea of self-defense under such circumstances is unavailing. There was evidence that on the late afternoon of the day of the homicide the defendant engaged the deceased in a quarrel; that this quarrel was at the defendant's own procurement and resulted in hostility which he himself created, and it was for the jury to say whether such action by the defendant was for the purpose of having the deceased act upon it.

■ It is insisted that the court erred in refusing the defendant's proposed instruction to the effect that the law does not permit the taking of human life, or the inflicting of great bodily injury, in the resisting of a mere trespass on one's property. This instruction was offered on the theory that the defendant's presence on the bank of the large reservoir just before the fatal moment was no more than a trespass upon the deceased's property and that the deceased had no right to pursue the defendant with the machete just before the fatal shot was fired. Assuming that the deceased did pursue the defendant in the dark just before he was killed (which the jury apparently believed did not take place), there is no evidence that he was pursuing the defendant because of any trespass by the defendant on the Contreras property. If the pursuit occurred at all, obviously it was because of the ill feeling engendered by the defendant in the late afternoon. The proposed instruction was not applicable to the facts.

It was also contended that the court erred in refusing to give the defendant's proposed instruction number 15, relating to the subject of a confession. The instruction is set forth in full in appellant's opening brief, but by inadvertence counsel had failed to note that this instruction was given by the court as instruction number 18.

The defendant was accorded a full and fair trial, was ably represented by counsel appointed by the court for that purpose. But we find no error in the record which would justify a reversal.

The judgment and the order are, and each is, affirmed.

Curtis, J., Edmonds, J., Waste, C. J., Langdon, J., Seawell, J., and Houser, J., concurred.