Filed 4/22/15  P. v. Jordan CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,  Plaintiff and Respondent,  v.  LAQUAN JORDAN,  Defendant and Appellant. | D064998  (Super. Ct. No. SCD234145) |

APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed as to the conviction; reversed as to the sentence and remanded for resentencing.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

Laquan Jordan appeals from a judgment convicting him of assault with a semiautomatic firearm with true findings on personal gun use and gang benefit enhancements. He argues: (1) his due process rights were violated because he was denied a bench trial; (2) there is insufficient evidence to support that he had the mental state for assault; and (3) the trial court erred in refusing to instruct on accident and defense of another. We reject these contentions.

As to sentencing, defendant asserts the trial court erred in imposing a sentence enhancement for both (1) personal use of a firearm (Pen. Code,[1] § 12022.5, subd. (a)) and (2) acting to benefit his gang in committing the serious felony of assault with a semiautomatic firearm (§§ 186.22, subd. (b)(1)(B), 1192.7, subd. (c)(31)). We agree the trial court imposed two enhancements based on firearm use, and this violated the statutory mandate in section 1170.1, subdivision (f) that only the greatest firearm use enhancement be imposed. Accordingly, we reverse the judgment as to the sentence and remand for resentencing.

For guidance on remand, we reject defendant's contention that the trial court abused its discretion when selecting upper term sentences.

FACTUAL AND PROCEDURAL BACKGROUND

*Overview*

The events giving rise to defendant's assault conviction occurred in the early morning hours of October 2, 2010, while defendant and three other males (Darius Peete,

---

[1] Subsequent unspecified statutory references are to the Penal Code.

Michael Dunbar, and Deandre Grey) were at an apartment complex. Defendant and his three companions are all members of the Skyline Piru gang.

There were two acts of violence that occurred at the apartment complex: (1) the murder of Aaron Robinson in his apartment on the first floor, and (2) the shooting of Angela Traylor in a corridor on the third floor. The authorities identified defendant, Dunbar, Grey, and Peete as the perpetrators of the violence based on a surveillance video at the apartment complex and other evidence gathered during their investigation.

The murder occurred when Peete fatally shot Robinson during an encounter involving Robinson's attempt to sell marijuana to Peete. Both Peete and defendant were charged with Robinson's murder, and during the prosecution's case-in-chief Peete pled guilty to the murder charge. After the prosecutor and defendant's counsel concluded their evidentiary presentations, the trial court granted defendant's motion for acquittal on the murder charge. Because of defendant's acquittal on this charge, we need not delineate the facts concerning Robinson's murder.

The Traylor shooting occurred when defendant fired a gun in response to a fight between Dunbar and Grey and several other individuals, and the bullet hit Traylor in the thigh. Based on this latter incident, the jury convicted defendant of assault with a semiautomatic firearm with personal firearm use and gang benefit enhancements.

*The Shooting of Traylor by Defendant*

The same night that Robinson was shot, a group of people were at Jasmine Sutton's third-floor apartment having a late-night party. One of the attendees, Lawrence Gigetts, testified that when he arrived at Sutton's apartment complex to attend the party,

3

there were several people outside in the front of the complex. When Gigetts was knocking on the front door of Sutton's third-floor apartment, he noticed that three males who had been in front of the complex had followed him. The males told him that they knew Sutton, but when he called Sutton on her phone to ask her to open the door, the three men left the area. When Gigetts described the three men to Sutton, she said she did not know them.

The Traylor shooting occurred as Traylor was leaving Sutton's apartment shortly before 3:49 a.m. Traylor and her boyfriend (Jamel Yancy) were walking down a narrow third-floor hallway that led to the stairwell. Jamel's sister (Joselyn Yancy) and Joselyn's boyfriend (James Calimee) were about 18 feet behind them.[2] Two males (later identified as Grey and Dunbar) approached Jamel and Traylor, and one of them said, " 'What's up, P?' " to Traylor, which apparently was a reference to prostitute. Traylor told the male she did not do this anymore; Jamel defended her; and "words were exchanged." One of the males used profanity, said something about fighting, and made a gang reference to " 'Piru' " and " 'blood.' " Jamel cursed back at the males, and said if they wanted to fight it was " 'nothing' " and he would not back down.

Grey and Dunbar (the assailants) then starting "jumping Jamel." Jamel was bent over and the two assailants were "kind of on his back," hitting him with their fists. Traylor, Joselyn, and Calimee (the victim group) tried to intervene and momentarily stopped the fight, but then the assailants called Traylor a "bitch" and told Joselyn "she

_____

2    Because they share the same last name, we refer to Jamel Yancy and Joselyn Yancy by their first names.

4

could get it too" and swung at her.[3]  Everyone started fighting; the assailants were pulling Jamel towards the stairwell banister in an attempt to throw him over the edge; and the victim group was trying to separate the two assailants from Jamel.  Both groups were throwing blows and there was a lot of yelling and screaming, including Traylor yelling " '[b]reak it up.  Stop' " and Joselyn yelling " 'get the fuck off my brother.' "  During the fight (which lasted about five minutes) Joselyn hit one of the assailants over the head with an unopened can of beer.

The victim group managed to separate Jamel from the assailants and stop the fight before any portion of Jamel's body was over the banister railing.  Both groups had fallen to the ground during the fight and the "tug of war" over Jamel, and then they all stood up.  At this point, a male (later identified as defendant) came up from downstairs; pointed a gun in the direction of the victim group; and "shot at" them.[4]  When the gun was fired, defendant was in an area by the stairs; the two assailants were to the side of the victim group; and the victim group was in the corridor about 15 feet away from defendant.

Joselyn and Calimee testified that at the time of the gunshot, the fight was over.[5] According to Joselyn, the two groups were backing away from each other, and although

---

[3]     Our reference to victim group will at times also include Jamel.

[4]     When asked whether defendant aimed or pointed the gun at the victim group, Calimee testified, "I mean, he pulled a gun out.  And you aim to shoot.  Yes, he was taking aim.  [¶] . . . [¶]  [He pointed the gun] [a]t our direction, yes.  [¶] . . . [¶]  [He] pulled the gun out and [he] aimed and [he] shot."

[5]     At trial, the incident was described primarily by Joselyn and Calimee, as Jamel and Traylor claimed not to remember most of what occurred.

there were still words being exchanged and some attempts at lunging, the fighting had stopped and they were too far away from each other (about eight feet) to make physical contact. Calimee recalled the gunshot occurring "kind of fast" after the two groups stood up from their fall to the floor, and he was not sure if they were backing away when the gun was fired.

As the victim group ran away to Sutton's apartment, they realized that Traylor had been shot. Traylor was screaming that she had been shot; they applied presure to stop the bleeding on her thigh; and they summoned the authorities. Apart from Traylor's gunshot wound (which required surgery), the victim group did not sustain any injuries other than soreness.

The corridor where the fight and the shooting occurred was a narrow, fairly confined area, with a cement floor and stucco walls. Crime scene specialists observed a bullet strike mark on a northern wall, and a bullet hole on an adjacent western wall. The strike mark was about two feet, seven inches from the floor, and the bullet hole was about two feet from the floor. Because the strike mark was about seven inches higher than the bullet hole, a prosecution crime scene specialist acknowledged this pattern was "[c]onsistent with a shot that was fired down towards the floor."

The authorities found bullets and cartridge casings associated with the Robinson murder and the Traylor shooting, including a bullet in the wall where Traylor was shot. A forensic examination of these casings and bullets showed the same semiautomatic gun was used in both the Robinson murder and the Traylor shooting.

6

*Gang Evidence*

A prosecution gang expert testified that if a Skyline Piru gang member approached someone and in the course of an argument mentioned the gang's name " 'Piru,' " this would tell the person the "gang is doing this" and would be a way of intimidating the person. Also, possession of a gun by gang members is a way of showing that they have power and they are willing to use the gun. It is common for gang members to know which gang members have a gun, and a particular gang member's possession of a gun increases the respect for that gang member within the gang.

The gang expert described numerous personal contacts, field interview reports, and arrest reports that showed the strong allegiance to their gang demonstrated by defendant and the three other gang members involved in the charged offenses. Defendant and his three gang cohorts had repeated gang-related contacts with the police for several years; their gang monikers were known to the police; they had been observed in photos and/or in person wearing distinctive red-colored gang clothing and paraphernalia and "throwing up" gang hand signs; and they had admitted their gang allegiance to the police. Dunbar and Grey were known to associate with each other, and defendant was known to associate with Dunbar. Defendant's gang moniker is "Baby LK Mad." LK stands for "Lincoln Killer"; and Lincoln is Skyline Piru's number one rival. Defendant had 31 gang-related contacts with the police from 2005 to 2011; he has been contacted in person and depicted in photos wearing Skyline Piru gang clothing and paraphernalia; and on several occasions he admitted gang membership to the authorities.

*Defense Case*

Peete (who had earlier pled guilty to the Robinson murder) and defendant testified during the defense case. Peete stated he shot Robinson and defendant was not with him when this occurred. Peete denied he gave his gun to defendant after he shot Robinson, but rather claimed he left the apartment complex with the gun and later threw it in the ocean.

Defendant testified he went to the apartment complex because he heard there was a party there; when he arrived at the complex he recognized Dunbar and Grey; and he met Peete for the first time that night. He and his three companions were not allowed into the party on the third floor, and they went back downstairs to the front of the complex. Thereafter, Dunbar and Grey went back upstairs; Peete walked away with Robinson; and defendant went to the front area of the complex and remained there talking to a female.

When Peete returned to the front area, he showed defendant a firearm, saying " 'Check this out.' " While defendant and Peete were talking, defendant heard the sound of a fight coming from upstairs. Knowing Dunbar and Grey were upstairs, defendant grabbed the gun and ran upstairs. Defendant testified, "When I got upstairs, I just seen a lot of people fighting, like a melee, and I fired a shot hoping to cease the fight, to end the fight from the two people I know that was involved in the fight. [¶] . . . [¶] . . . From the looks of it, it was like 12-5, or I don't know the exact number, seeing bottles flying and stuff of that nature. I know it wasn't the right thing to do, but from like—I seen that happen before to where people was fighting and people hear a shot and everything kind

8

of ceased, so I thought that was what was going to happen." He stated he fired to the right and "[t]owards the ground," and he was not trying to hit anyone. After firing the gun, he stayed only a few seconds and it appeared the people had stopped fighting. He turned around, ran back downstairs, and left. He testified he did not know he had shot someone, and he threw the gun away because he had "no use for it." Defendant admitted he had associated with the Skyline Piru gang, but denied he was a gang member.

### Jury Verdict and Sentence

The jury convicted defendant of assault with a semiautomatic firearm, with true findings that he personally used a firearm and committed the offense for the benefit of his gang. The court sentenced him to 24 years in prison.

### DISCUSSION

### I. Denial of Request for Bench Trial

Defendant argues the trial court violated his due process rights because it denied his request for a bench trial.

### A. Background

After the jury had been selected and on the morning testimony was set to commence in defendant and Peete's joint trial, defendant (through his counsel and personally) requested that he be given a bench trial rather than a jury trial. Defense counsel told the court there were evidentiary items likely to be admissible on a broader scope in a bench trial, including evidence of codefendant Peete's conviction for attempted murder and assault with a firearm for an incident that occurred about one month after the

9

current charged murder of Robinson. Peete declined to waive his jury trial right, and the prosecutor stated it would not agree to waive a jury unless Peete agreed to do so.

The court denied defendant's request for a bench trial, stating that both the defendant and the prosecutor had to agree to waive a jury. The court commented that the bench trial request could alternatively be viewed as the equivalent of a midtrial severance motion, but there was a legislative preference for a joint trial of the same offense absent a strong showing of inconsistent defenses and prejudice. The court stated that if defendant's counsel thought it appropriate, he could file a midtrial severance motion with supporting affidavits to support the motion.[6]

Thereafter, defense counsel did not file a severance motion, and defense counsel made no further requests for a bench trial, including when codefendant Peete pled guilty during the prosecution's case-in-chief.[7]

---

[6] Contrary to defendant's claim on appeal, the trial court did not in effect treat his request for a bench trial as a severance motion, but rather invited defense counsel to file a severance motion if he chose to do so.

[7] At the conclusion of the prosecution's case-in-chief, defense counsel moved for a mistrial based on Peete's guilty plea. The court denied the motion because there was no showing of prejudice to defendant. When presenting the mistrial motion to the court, defense counsel noted the previous request for a bench trial, but did not ask the court to change the case to a bench trial given that Peete was no longer part of the proceedings. Likewise, during a *Marsden* hearing at the conclusion of the prosecution's case-in-chief, defendant told the court that he was not told he had the option of a bench trial until the time of jury selection, but he did not ask the court to give him a bench trial at this juncture.

B. *Analysis*

On appeal, defendant contends that a defendant's constitutional right to a trial by a jury also extends to a right to *decline* a trial by a jury. He also posits that a defendant's due process rights are violated if the prosecution is allowed to block the granting of a bench trial request when there are compelling reasons why a jury trial might be prejudicial to the defendant.

Contrary to defendant's claim, it is well established that there is no right to a bench trial under the federal or California Constitutions. As defendant recognizes, the United States Supreme Court has found no such right under the federal Constitution. (*Singer v. United States* (1965) 380 U.S. 24, 34-36 (*Singer*).) Consistent with this, the California Constitution explicitly permits waiver of the jury trial right only upon agreement of *both* parties. (Cal. Const., art. I, § 16 ["A jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel."]; *People v. Washington* (1969) 71 Cal.2d 1061, 1086-1087 [rejecting argument that prosecutor's refusal to consent to bench trial violated defendant's constitutional rights]; *People v. Partner* (1986) 180 Cal.App.3d 178, 182-183 [same]; see *People v. Memro* (1995) 11 Cal.4th 786, 875.) As explained in *Singer*, "The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right. [¶] . . . [¶] . . . A defendant's only constitutional right concerning the method of trial is to an impartial trial by jury. We find no constitutional impediment to conditioning a waiver of this right on the consent of the prosecuting attorney and the trial judge when, if either refuses to consent, the result is simply that the defendant is subject

11

to an impartial trial by jury—the very thing that the Constitution guarantees him."
(*Singer, supra*, at pp. 34-36.)

Moreover, assuming there may on occasion be compelling reasons to grant a defense request for a bench trial over prosecutorial objection so as to ensure a fair trial (see *Singer, supra*, 380 U.S. at p. 37; *United States v. Clark* (7th Cir. 1991) 943 F.2d 775, 784; *People v. Sims* (1982) 32 Cal.3d 468, 483, fn. 13), defendant has not shown any such circumstances here. Defendant has not cited to anything showing that a jury could not fairly resolve his case, nor that he was prevented from introducing evidence because the case was tried by a jury rather than the court. Indeed, even after codefendant Peete was no longer part of the case because he pled guilty—thus removing the prosecutor's reason for declining to agree to a bench trial—defendant did not ask the trial court to switch to a bench trial. To the extent defendant suggests his gang membership would have made him unpopular with the jury, this factor alone does not establish that a jury could not impartially evaluate whether he was guilty of the charged offense.

Defendant has not shown the trial court's refusal to grant him a bench trial violated his constitutional rights or deprived him of a fair trial.

## II. *Challenges to Assault Conviction*

To review defendant's challenges to his assault conviction based on insufficiency of the evidence and instructional error, we first summarize the general principles governing the crime of assault.

12

A. *The Offense of Assault*

An assault occurs when the defendant willfully commits a wrongful act that by its nature will directly and probably result in the application of physical force on another. (*People v. Colantuono* (1994) 7 Cal.4th 206, 214; see *People v. Trujillo* (2010) 181 Cal.App.4th 1344, 1355 ["the gravamen of assault is the *likelihood* that the defendant's action will result in a violent injury to another"].)  Assault is a general intent crime, requiring that the defendant commit the proscribed act willfully; i.e., on purpose. (*Colantuono, supra*, at p. 214; *People v. Williams* (2001) 26 Cal.4th 779, 782; *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1194.)  Further, the defendant must have knowledge of facts that would lead a reasonable person to realize the application of force would directly and probably result from the act; mere reckless or negligent conduct without knowledge of these relevant facts does not suffice to establish the offense. (*Williams, supra*, at p. 788.)

However, assault does not require the specific intent to injure because the assaultive act, by its nature, subsumes this intent.  (*People v. Williams, supra*, 26 Cal.4th at p. 786.)  "Although the defendant must intentionally engage in conduct that will likely produce injurious consequences, the prosecution need not prove a specific intent to inflict a particular harm. . . .  Because the offensive or dangerous character of the defendant's conduct, by virtue of its nature, contemplates such injury, a general criminal intent to commit the act suffices to establish the requisite mental state."  (*People v. Colantuono, supra*, 7 Cal.4th at pp. 214-215.)

13

B. *Sufficiency of Evidence To Support Mental State for Assault*

Defendant contends there is insufficient evidence to support that he had the mental state required for the assault charge. In support, he contends he fired a single shot towards the ground and was merely trying to stop the fight, no one saw him aim the gun at any person, and it was unpredictable whether the bullet would ricochet and hit someone.

In reviewing a challenge to the sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) It is the exclusive province of the jury to determine credibility and to resolve evidentiary conflicts and inconsistencies, and we presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*Ibid*.; *People v. Young* (2005) 34 Cal.4th 1149, 1181.) If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*Nelson, supra*, at p. 210.)

Witnesses in the victim group testified defendant fired the gun in their direction, at a time when the fight was over, and from a distance of about 15 feet. Further, the prosecution introduced evidence showing defendant's strong gang affiliation and the gang culture of using firearms to gain respect for the gang. From this evidence, the jury could reasonably infer that defendant was firing at the victims to support his gang companions and to intimidate the victims by showing the gang will not hesitate to use firearms when

14

gang members are involved in fights. Although the trajectory shown by the bullet mark and hole could support that defendant was aiming towards the ground, the jurors were not required to reach this conclusion. The jurors could instead deduce that defendant aimed at the victims and the bullet hit Traylor in the leg, exited, and then proceeded to the north wall and ricocheted down to the west wall.

Moreover, even if the jurors thought defendant did aim at the floor, they could consider that he discharged the gun in a narrow corridor where there were hard surfaces that could easily cause the bullet to ricochet and hit someone. Notably, defendant did not fire the gun directly where he was standing or behind himself at a location away from the victims, but rather fired *in the direction* of the victims. From this evidence, the jurors could deduce that defendant had knowledge of facts from which a reasonable person would know someone in the victim group was likely to be hit by the bullet. (See, e.g., *People v. Williams, supra*, 26 Cal.4th at p. 790 [defendant's act of firing warning shot in direction of vehicle where he knew victim was crouched constituted act that by its nature would directly, naturally, and probably result in a battery].) Based on the showing that defendant was aware of facts indicating that discharge of a gun would directly and probably cause someone to be shot, the jury could reasonably find that he did not fire the gun in a merely negligent or reckless manner but rather engaged in the willful, knowing conduct required for the offense of assault.

The record supports the assault verdict.

C. *Refusal To Instruct on Defenses of Accident and Defense of Another*

Defendant argues the trial court erred because it refused his requests to instruct the jury on the defenses of accident and defense of another.

Upon request by the defendant, a trial court is required to instruct on a defense that is supported by substantial evidence. (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677.) When deciding whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the evidence, but only whether there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt of guilt. (*People v. Salas* (2006) 37 Cal.4th 967, 982.) The court must "take the proffered evidence as true, 'regardless of whether it was of a character to inspire belief. . . .' [Citation.] ' "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused.". . . .' [Citation.] Even so, the test is not whether *any* evidence is presented, no matter how weak. Instead, the jury must be instructed when there is evidence that 'deserve[s] consideration by the jury, i.e., "evidence from which a jury composed of reasonable [people] could have concluded" ' that the specific facts supporting the instruction existed." (*People v. Petznick, supra*, at p. 677.) On appeal, we independently review the court's refusal to instruct on a defense. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

1. *Refusal To Instruct on Accident*

The accident defense applies if the defendant acted " 'without the intent required for [the] crime, but acted instead accidentally.' " (*People v. Anderson* (2011) 51 Cal.4th

16

989, 996; § 26; see CALCRIM No. 3404.)[8]  As set forth earlier, the mental state required for assault is knowledge of the relevant facts and willful commission of a wrongful act that will directly and probably result in the application of force; there is no requirement that the defendant intended to harm the victim.  (*People v. Williams, supra*, 26 Cal.4th at pp. 782, 786, 788; *People v. Colantuono, supra*, 7 Cal.4th at p. 214.)  Thus, an accident defense can apply to charges of assault when the defendant unwillingly or unknowingly (i.e., accidentally) committed an act that directed force towards the victim.  (See, e.g., *People v. Corning* (1983) 146 Cal.App.3d 83, 88-89 [accident defense based on evidence of accidental discharge of gun]; *People v. Lara* (1996) 44 Cal.App.4th 102, 106 [accident defense based on evidence defendant unintentionally hit victim while turning around].)

Defendant's claim that he was entitled to an accident instruction is based on his testimony (and consistent forensic evidence) that he shot towards the ground with the intent of ending the fight.  Defendant's act of shooting towards the ground constituted a purposeful firing of the weapon; i.e., there is no claim that the gun fired accidentally.

Thus, defendant's act of firing the gun was entirely volitional, and there were no facts suggesting some kind of nonvolitional conduct that could support an accident defense.  When considering defendant's claim that he purposefully shot towards the

---

[8]     Section 26 states:  "All persons are capable of committing crimes except those belonging to the following classes:  [¶] . . . [¶]  Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence."
        CALCRIM No. 3404 states in relevant part:  "The defendant is not guilty . . . if [he or she] acted . . . without the intent required for that crime, but acted instead accidentally . . . ."  (Bracketing in original omitted.)

17

ground, the jury needed to evaluate whether under all the circumstances his volitional act of shooting towards the ground (if credited) constituted an act that a reasonable person would know would directly, probably, and naturally lead to someone being shot, thus providing the criminal mens rea for assault. If the jury thought it was improbable that a bullet would ricochet and strike someone, it would have acquitted defendant not because his conduct was accidental, but because his conduct did not constitute an assault—i.e., there was no significant likelihood it would result in the application of force. In this circumstance, the shooting of the victim from a ricocheting bullet could be viewed as accidental in the colloquial sense, but it would not have been accidental in the legal sense because defendant's act of shooting into the ground was purposeful. In other words, under the defense theory the shooting of the *victim* may have been accidental, but because the shooting of the *gun* was not accidental and assault is a general intent crime, there was no basis for an accident instruction.

Nor is this a case where there was some relevant fact unknown to defendant that could support an accident instruction—for example, when a defendant fires a gun without knowing there is a person in the vicinity. To the extent defendant claimed he did not realize a bullet could ricochet and hit someone, this was not a matter of unknown *facts* but rather a matter of unknown *probabilities* relevant to the jury's determination of whether an assault occurred based on a reasonable person's perceptions of the likelihood that someone could be shot.

Citing section 26, defendant argues the accident instruction was required because there was evidence showing he lacked "evil design" or "intention" because his intent was

18

to break up the fight.  (See fn. 8, *ante*.)  Section 26's reference to the absence of evil design or intention for accident must be interpreted in the context of the particular mental state associated with the charged offense.  (See *People v. Anderson, supra*, 51 Cal.4th at p. 997 [accident defense can apply if defendant acted without forming the mental state necessary to make his or her actions a crime].)  The mental state for assault is the intent to do the wrongful act and knowledge of the facts that make the application of force a natural and probable result.  Because there was no evidence that defendant lacked an intent to do the act of firing or was unaware of relevant facts, there was no basis to provide an accident instruction.

To the extent defendant relies on the evidence of his intent to break up the fight, this subjective intent was irrelevant for purposes of evaluating whether he acted accidentally rather than volitionally or without knowledge of relevant facts for purposes of an accident defense to assault.  The evidence of defendant's intent to break up the fight is, however, relevant to his contentions concerning defense of another, which we discuss below.

The trial court did not err in refusing to instruct on the defense of accident.

### 2. *Refusal To Instruct on Defense of Another*

To support a claim of self-defense or defense of another, the defendant must reasonably believe there is a threat of imminent bodily injury and the immediate use of force is necessary, and must use an amount of force that is reasonable under the circumstances.  (*People v. Hernandez* (2011) 51 Cal.4th 733, 747; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1093 (conc. opn. of Brown, J.).)  The justification does not

19

require the existence of actual danger but rather depends upon appearances; it is sufficient that the circumstances be such that a reasonable person would be placed in fear for his or another's safety and that the defendant acted out of that fear. (*Humphrey, supra*, at p. 1093.)

However, the defendant " 'may use only that force which is necessary in view of the nature of the attack . . . .' " (*People v. Humphrey, supra*, 13 Cal.4th at p. 1094.) That is, the defendant " 'may use so much force as [appears reasonably] necessary to meet such danger and no more. If he goes beyond this limit, he transcends the law of self-defense, and becomes himself a wrongdoer.' " (*People v. Aguirre* (1938) 11 Cal.2d 248, 253.)

When declining to instruct on defense of another, the trial court recognized that firing a warning shot could trigger defense-of-another principles. However, the court reasoned that to justify the use of deadly force such as from the discharge of a firearm, the perceived threat must be of "equal magnitude." The court stated it was accepting what defendant said as true and it was not weighing the evidence, but concluded there was no evidence that anyone was about to suffer death or great bodily injury so that defendant could have reasonably believed discharge of a gun was necessary. The court concluded, "You can't use a gun to break up a fist fight, even if you're firing it as a warning shot." In response to defense counsel's claim that the beer can used by Joselyn constituted use of a deadly weapon, the trial court stated this claim was "too great a leap."

Defendant testified he shot the gun as a warning shot to break up the fight and he shot towards the ground. His testimony suggested he thought his friends were outnumbered during the melee, and he referred to seeing "bottles flying and stuff of that

20

nature." This testimony could support inferences that defendant thought his friends might lose the fight and they could be injured by flying bottles, and accordingly he fired the gun in a defensive attempt to break up the fight. However, defendant did not dispute that he fired in the direction of the victim group. Conspicuously absent from his testimony is any suggestion that anyone was armed with a deadly weapon or that someone was about to experience injury that would warrant the use of force *in the form of discharging a firearm in the direction of people*. Defendant's claim that he saw bottles flying, as well as Joselyn's testimony that she hit one of the assailants over the head with an unopened beer can, do not alone reflect that a reasonable person would think the risk of injury was sufficiently elevated as to necessitate firing a firearm in the direction of people. Also, defendant made no claim that he saw someone about to be thrown over the railing, and according to the victims this conduct had stopped when defendant reached the third floor and fired the shot.

A firearm is a deadly weapon and when, as here, it is fired in the direction of other individuals (even if aimed towards the ground as a warning shot) it creates a serious likelihood of injury given the danger of ricochet and/or misaiming. Further, introducing a firearm into a fight involving no deadly weapons or other overtly life-threatening conduct can significantly escalate the potential for deadly violence. Accordingly, the justifiable firing of a firearm as a defensive measure in this circumstance requires a high degree of imminent injury to be proportionate to the degree of danger created by the firearm discharge. The trial court properly concluded there were no facts that could cause a reasonable person in defendant's position to believe the corridor fight posed a

21

sufficiently high threat of imminent injury to justify firing a gun in the direction of the combatants. The court did not err in refusing to instruct on defense of another.

### III. *Sentencing Challenges*

The trial court sentenced defendant to a total term of 24 years. The sentence consisted of a nine-year upper term for the assault with a semiautomatic firearm conviction (§ 245, subd. (b)); a 10-year upper term for his personal use of a firearm (§ 12022.5, subd. (a)); and five years for the gang benefit enhancement (§ 186.22, subd. (b)(1)(B)).

### A. *Erroneous Imposition of Two Enhancements for Firearm Use*

Defendant argues the trial court erroneously imposed two enhancements for his firearm use; i.e., (1) an enhancement pursuant to section 12022.5, subdivision (a) for personal firearm use, and (2) an enhancement pursuant to section 186.22, subdivision (b)(1)(B) based on the serious felony of assault with a deadly weapon. As we shall explain, we agree that this constitutes two enhancements for the same firearm use in the commission of a single offense, which is contrary to the statutory mandate set forth in section 1170.1, subdivision (f) that only the greatest firearm use enhancement be imposed.[9]

Section 1170.1(f) provides that when two or more enhancements may be imposed for firearm use, only the greatest of those enhancements shall be imposed. That is, section 1170.1(f) states: "*When two or more enhancements may be imposed for* being

---

[9] For simplicity, we shall omit references to "subdivision" when referring to statutes in this section of our discussion.

22

armed with or *using* a dangerous or deadly weapon or *a firearm* in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. . . ."  (Italics added.)

Section 12022.5(a) provides for a three-, four- or 10-year enhancement when a person "*uses a firearm* in the commission of a felony . . . ."  (Italics added.)  Here, the court imposed the 10-year upper term for defendant's firearm use.

Section 186.22(b)(1) provides for three possible sentences when the defendant commits an offense for the benefit of a gang:  (1) two, three, or four years if the defendant's offense is not a serious or violent felony (§ 186.22(b)(1)(A)); (2) five years if the offense is a serious felony as defined in section 1192.7(c) (§ 186.22(b)(1)(B)); and (3) 10 years if the offense is a violent felony as defined in section 667.5(c) (§ 186.22(b)(1)(C)).  Section 1192.7(c)(31) lists the offense of *assault with a semiautomatic* firearm as a serious felony.[10]  Here, the court imposed the five-year gang benefit enhancement under section 186.22(b)(1)(*B*) based on defendant's conviction of the serious felony of assault with a semiautomatic firearm.  Had defendant's substantive offense *not* qualified as a serious felony, the sentence on the gang enhancement would have been two, three, or four years under section 186.22(b)(1)(*A*).

In *People v. Rodriguez* (2009) 47 Cal.4th 501 (*Rodriguez*), the trial court imposed (1) an enhancement under section 12022.5(a) for personal firearm use, and (2) a 10-year

---

10    Section 1192.7(c)(31) defines a serious felony as including "assault with a deadly weapon, firearm, machinegun, assault weapon, or semiautomatic firearm . . . in violation of Section 245."

23

gang enhancement under section 186.22(b)(1)(C) because the defendant's conviction (assault with a firearm with an enhancement for personal firearm use) qualified as a violent felony under section 667.5(c)(8). (*Rodriguez, supra*, at pp. 504-505.) Section 667.5(c)(8) defines a violent felony as including "any felony in which the defendant uses a firearm which use has been charged and proved as provided in . . . Section 12022.5." The *Rodriguez* court concluded the defendant's sentence had been enhanced twice for his firearm use, which was contrary to the requirement in section 1170.1(f) that only the greatest firearm use enhancement be imposed. (*Rodriguez, supra*, 47 Cal.4th at pp. 504, 508-509.)

*Rodriguez* reasoned: "[T]he standard additional punishment for committing a felony to benefit a criminal street gang is two, three, or four years' imprisonment. (§ 186.22, subd. (b)(1)(A).) But when the crime is a 'violent felony, as defined in subdivision (c) of Section 667.5,' section 186.22's subdivision (b)(1)(C) calls for additional punishment of 10 years. Here, defendant became eligible for this 10-year punishment only because he 'use[d] a firearm which use [was] charged and proved as provided in . . . Section 12022.5.' (§ 667.5, subd. (c)(8).) Thus, defendant's firearm use resulted in additional punishment not only under section 12022.5's subdivision (a) (providing for additional punishment for personal use of a firearm) but also under section 186.22's subdivision (b)(1)(C), for committing a violent felony as defined in section 667.5, subdivision (c)(8) (by personal use of firearm) to benefit a criminal street gang. Because the firearm use was punished under two different sentence enhancement provisions, each pertaining to firearm use, section 1170.1's subdivision (f) requires

24

imposition of 'only the greatest of those enhancements' with respect to each offense."
(*Rodriguez, supra*, 47 Cal.4th at p. 509.)

Subsequent to *Rodriguez*, the California Supreme Court granted review in a case from our court, in which we rejected the People's contention in a cross-appeal that the trial court should have imposed the same two enhancements at issue in the case currently before us: i.e., (1) an enhancement under section 12022.5(a) for personal firearm use, and (2) a five-year gang enhancement under section 186.22(b)(1)(B) based on a conviction of the serious felony of assault with a semiautomatic firearm (§ 1192.7(c)(31)). (*People v. Le*, review granted May 31, 2012, S202921.) Applying *Rodriguez*, we concluded section 1170.1(f) required imposition of only one enhancement based on the defendant's firearm use, and thus an enhancement could not be imposed under both the personal firearm use statute and the gang benefit/serious felony/assault with a firearm statutes. Our high court granted review in *Le* to consider whether *Rodriguez*'s holding applied in this circumstance.

Here, the trial court enhanced defendant's sentence by (1) 10 years because he personally used a firearm (§ 12022.5(a)), and (2) five years (instead of two, three or four years) based on a gang enhancement that was triggered because the substantive offense was the serious felony of assault with a semiautomatic firearm (§§ 186.22(b)(1)(B), 1192.7(c)(31)). Comparable to the situation in *Rodriguez*, defendant became eligible for the elevated five-year gang punishment—rather than the standard two-, three-, or four-year gang punishment—because he committed an offense that involves the use of a firearm. Thus, both the gun use enhancement and the gang enhancement imposed in this

25

case are derived from defendant's same act of using a firearm in the commission of a single offense.

We note that, as pointed out by the Attorney General, the sentence imposed in this case (unlike the circumstances in *Rodriguez*) does not involve the dual use of the *same* firearm enhancement statute (i.e., § 12022.5, personal firearm use) to impose two enhancement terms. Nevertheless, the court imposed an enhancement sentence twice for the same *act* of firearm use. Section 1170.1(f) broadly imposes a dual-use restriction whenever multiple enhancements are available for "*using . . . a firearm*," with no suggestion that this restriction applies only to dual use of the same firearm use enhancement statute. Based on the plain language of section 1170.1(f), and pending resolution of the issue by our high court, we conclude *Rodriguez*'s holding applies equally here.

Accordingly, we reverse the sentence and remand for resentencing. (See *People v. Rodriguez, supra*, 47 Cal.4th at p. 509.)

## B. *Selection of Upper Terms*

For guidance on remand, we address defendant's claim that the trial court abused its discretion when selecting upper terms for the substantive assault count and the personal gun use enhancement.

When deciding whether to impose an upper, middle or lower term, the trial court is required to set forth its reasons for imposing the term it selects. (*People v. Sandoval* (2007) 41 Cal.4th 825, 846-847.) The trial court's discretion must be exercised in a manner that is not arbitrary and capricious, and its decision must be based on

26

individualized, relevant, and proper considerations. (*Id.* at p. 847.) The court is not required to presume the middle term is the appropriate term, and a single aggravating circumstance suffices to support an upper term sentence. (*People v. Weber* (2013) 217 Cal.App.4th 1041, 1063-1064.)

The probation report shows that defendant has a juvenile record reflecting his commission of weapons-related offenses in 2004 and 2006 when he 13 and 16 years old. During these offenses he possessed a locking blade knife on a school campus; he and several companions burglarized and stole paintball guns and related equipment from a sporting goods store; and he threw a loaded gun out of a car window while he and several companions were being detained by the police for a shooting. The juvenile court imposed gang restrictions as conditions of his release for the offenses in 2006. The probation report delineates his various contacts with the police, probation violations, continued gang involvement, participation in a gang-related fight, and placement in various juvenile and home supervision programs. In 2010, at age 20, he committed the current offense in which he discharged a firearm and injured a victim.

The court found that defendant's record showed increasing violence and a "continued affinity for weapons that has now escalated to firing one and hurting somebody . . . ." The court stated that although the shot involved a ricochet, it was also "essentially a funnel or a tunnel situation. It was a long, narrow corridor with a group of people down there. And any shot that gets fired is going to have a risk of hitting somebody. And we know that that happened."

27

The court's selection of upper terms is supported by the showing that defendant's offenses were increasing in seriousness and his violent conduct had now escalated to the point that he intentionally fired a gun and injured someone. Defendant's contention that the court did not consider mitigating factors is unavailing. We presume the court considered all relevant factors absent a contrary affirmative showing in the record. (*People v. Kelley* (1997) 52 Cal.App.4th 568, 582.) The court's selection of upper terms was not an abuse of discretion.

### IV. *Claim of Cumulative Error*

Defendant's claim that the cumulative effect of error deprived him of a fair trial is unavailing. We have found no error except for the sentencing error that requires a remand.

### DISPOSITION

The judgment is affirmed as to the conviction. The judgment is reversed as to the sentence and remanded for resentencing in a manner consistent with this opinion.

HALLER, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.

28