Filed 8/14/15  P. v. Medrano CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066851 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS266174) |
| FEDERICO JESUS MEDRANO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Edward P. Allard III, Judge.  Affirmed.

Jared G. Coleman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Charles C. Ragland and Kristen Hernandez, Deputy Attorneys General, for Plaintiff and Respondent.

Federico Jesus Medrano appeals from a judgment convicting him of attempted murder and assault with a deadly weapon. He argues his attempted murder conviction must be reversed because the record does not support that he had the intent to kill. We reject this contention and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The charges against defendant arose from an altercation in front of a convenience store between the victim (Nicholas Ferraro), defendant, and defendant's two male companions (Daniel Perez and Ricardo Marroquin). At about 9:32 p.m. on October 15, 2012, Ferraro arrived in his vehicle at the store's parking lot, accompanied by his girlfriend (Esmeralda Vizcarra). Defendant was standing outside the store with his two male companions. Defendant's group was also accompanied by a female (Dana Roman), who was in the parking lot in her car. At trial, the altercation was described by Ferraro and Vizcarra and depicted in surveillance CD's. Defendant also testified on his own behalf.

When Ferraro arrived at the store, he noticed defendant, Marroquin and Perez standing by the store entrance, and he thought they "looked a little shady. [¶] . . . [¶] . . . like they were looking for trouble." As Ferraro approached the store, Marroquin came up to him and asked for a cigarette and "where [he] was from," meaning whether he was in a gang. Ferraro replied he did not have a cigarette and he was "not from anywhere."

After Ferraro made his purchase in the store and came back outside, Marroquin again asked him where he was from, and Ferraro responded "nowhere." Ferraro was

2

trying to walk back to his car, but Marroquin and Perez continued to approach him and ask where he was from. Perez started using a "cocky" tone of voice and was acting "a little bit more aggressive," and Ferraro felt he needed to get out of there. Ferraro had noticed numerous tattoos on Perez and Marroquin related to a National City gang. In an attempt to "smooth things out," Ferraro tried to shake their hands and mentioned a male acquaintance who was well known in National City. Perez refused to shake Ferraro's hand and said, "what the fuck, you don't bang?"

Ferraro's girlfriend (Vizcarra) yelled at Ferraro to get in the car. Ferraro did so, but then Perez knocked on his window and Ferraro rolled down the window. Perez grabbed Ferraro by his shirt and tried to pull him out of his car, and, unable to do so, spit in his face. Feeling degraded by the spitting and intending to fight, Ferraro jumped out of his car and hit Marroquin (who was closest to him) in the face, causing Marroquin to fall to the ground. Perez had moved to the back of Ferraro's car, and Ferraro went over and punched Perez. Marroquin kicked Ferraro in the back of the leg, causing Ferraro to fall to the ground. Ferraro immediately got up from the ground, and at this point defendant came over. Prior to this, defendant had been standing off to the side by Roman's car and not participating in the physical altercation.

Vizcarra, meanwhile, had gotten out of Ferraro's car when the fight started, and she saw defendant retrieve a long silver object from the "little bin[]" in the side panel of the driver's door of Roman's car. Vizcarra saw defendant approach Ferraro, Perez, and Marroquin, who were now all "kind of in a huddle," with Perez on one side of Ferraro and Marroquin on the other side. According to Vizcarra, at some point Ferraro had also

3

knocked Perez to the ground, and Perez had gotten back up. As defendant approached the group, he was holding the silver object behind his body. When defendant was about five feet away, Vizcarra heard defendant yell "hold him." Likewise, Ferraro heard defendant tell his two companions, in a "calm but . . . stern" voice, to "hold him down."

As Perez and Marroquin grabbed Ferraro's arms and tried to hold him, Ferraro was "[t]hrowing as many punches as [he] could just to break away." Ferraro testified they "ended up in a ball," with Ferraro "fighting everybody off." Defendant stabbed Ferraro in his head and right side. Vizcarra testified that after defendant stabbed Ferraro, defendant was "smiling" or "smirking." When asked if defendant appeared angry, Vizcarra testified he appeared "more scared," explaining "[w]hen you see someone nervous or scared their chest kind of, it was either that or the adrenaline as he was backing away."

As the assault was occurring, Vizcarra yelled to Roman that she had Roman's license plate number. In response, Roman yelled at defendant and his companions to get in the car, and they drove away from the scene. Ferraro testified he was "amped up" and he realized his head was bleeding, but he did not immediately realize he had been stabbed in his side. As defendant and the others were driving away, Ferraro "stupidly" threw up a sign and screamed the name for the Otay neighborhood where he grew up, even though he was not a gang member.

*Stab Wound Injuries Inflicted by Defendant*

Ferraro testified that during the attack it appeared defendant was trying to stab him in the chest and neck area, but Ferraro may have been "wiggling too much" for defendant to get a "clean shot," and defendant stabbed Ferraro in the head and flank area near his

4

kidney.  Ferraro was bleeding heavily, and Vizcarra drove him to a hospital emergency room.  Ferraro had a large, 12-centimeter-long laceration on the left side of his forehead, and a five-centimeter-long laceration on his right flank area.  The forehead and flank wounds were "gaping open" about one or two centimeters wide.

The examining emergency room physician testified that an injury to the flank area can cause severe, life-threatening, internal bleeding because of the organs and large blood vessels located in that area.  Because of this concern, Ferraro was transferred by ambulance from the emergency room to a trauma center equipped to handle acutely injured patients.

A CAT scan performed at the trauma center showed Ferraro was bleeding internally.  Ferraro's flank wound was large enough for the trauma center surgeon to place a "sponge in deep, pack the wound" to attempt to stop the internal bleeding.  The bleeding did not stop, so the following day Ferraro underwent surgery.  During the surgery, the surgeon saw that Ferraro's flank wound was deep (about four to six inches); it was causing a lot of bleeding of the muscles; and it had fortunately missed the kidney and major blood vessels.  The surgeon used sutures and clips to stop the bleeding; used "electrocautery" to cause the tissue to coagulate; and closed the wound in layers.  The surgeon testified that without surgery Ferraro could have gone into shock and died.

*Gang Evidence*

Prosecution gang experts testified defendant was a member of the Oceanside Varrio Posole gang; Perez and Marroquin were members of the National City Block Boys gang; the two gangs were not rivals; and it was not uncommon for gang members from

5

different sets and areas to commit crimes together. An expert opined that an assault in which a gang member escalates the violence by using a weapon when the victim has no weapon benefits the gang by enhancing its reputation for violence.

*Defense*

Defendant (corroborated by his girlfriend who also testified) claimed he was no longer in a gang and he had moved out of Oceanside to distance himself from the gang. Defendant testified he knew Perez but had met Marroquin only that night. He claimed he was not aware that Marroquin and Perez were talking with anyone outside the store; he did not hear them ask Ferraro where he was from; and he did not see Perez try to pull Ferraro out of his car or spit at him. According to defendant, when he first paid attention to what was occurring, Ferraro was by the back of his car swinging at Perez. Perez either got hit or tripped and was "down with his back against the [ground] crawling backwards." Marroquin was standing to the side "as if he was frozen, as if he was scared to advance."

Because Perez was "backpedaling" and Marroquin was standing immobile, defendant "imagined [Ferraro] probably must have a weapon" that he was "pulling out." Defendant retrieved a pocket knife he had clipped onto his pocket, ran up, and stabbed Ferraro in the torso area once because he "thought [his] friend's life was in danger." Defendant acknowledged he "specifically stabbed him in the torso area" and he was not trying to stab him in another area such as the foot or hand. Defendant also acknowledged he did not see any blood on his two companions and he did not see Ferraro holding a weapon.

6

Defendant claimed he did not tell Perez and Marroquin to hold Ferraro before he stabbed him; he was not trying to kill Ferraro; and his conduct had nothing to do with gangs. After stabbing him, defendant realized Ferraro did not have a weapon. Defendant started backing up and then left the scene in the car.

*Jury Verdict and Sentence*

Defendant was charged with attempted murder (count 1) and assault with a deadly weapon (count 2), with allegations that he acted to benefit a gang, inflicted great bodily injury, and (for count 1) used a deadly weapon. The jury was instructed that it should find defendant not guilty of the charged offenses if he acted in reasonable self-defense or defense of another, or it should reduce the attempted murder charge to attempted voluntary manslaughter if he acted in unreasonable self-defense or defense of another. Rejecting the claim that defendant was acting defensively, the jury convicted defendant as charged.

At sentencing, the court struck the punishment on the gang enhancement and sentenced defendant to an 11-year prison term (i.e., a seven-year midterm for attempted murder, three years for infliction of great bodily injury, one year for deadly weapon use, and a stayed term on the assault count).

DISCUSSION

Defendant argues the record does not support a finding of intent to kill required for attempted murder.

*Relevant Law*

Attempted murder requires the intent to kill. (*People v. Avila* (2009) 46 Cal.4th 680, 701.) Intent to kill may properly be inferred from " 'the defendant's acts and the circumstances of the crime.' " (*Ibid.*) No one factor is necessarily dispositive; rather, the totality of the circumstances may be examined, including, for example, the defendant's words, the manner of the attack, the number and location of the wounds, and the victim's evasive measures. (See *id.* at p. 702; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1552 ["fact that appellant missed [victim's] heart and lungs was fortuitous rather than indicative of the absence of intent to kill"]; *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 [evidence supporting intent to kill included fact that "defendant stabbed the victim not in the arm or leg, but in the abdomen, an extremely vulnerable area of the body"].)

Even if the defendant acted with intent to kill, under principles of self-defense or defense of another, the defendant is entitled to an acquittal if he actually and reasonably believed there was an imminent danger of death or great bodily injury, or to a voluntary manslaughter or attempted voluntary manslaughter verdict if he actually but unreasonably believed in the need for defensive action. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; *People v. Manriquez* (2005) 37 Cal.4th 547, 581; *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 833-834.) Application of these defensive principles requires that the defendant use only " 'so much force as is necessary to meet such danger and no more. If

8

he goes beyond this limit, he transcends the law of self-defense, and becomes himself a wrongdoer.' " (*People v. Aguirre* (1938) 11 Cal.2d 248, 253; *People v. Hardin* (2000) 85 Cal.App.4th 625, 629-630 [" 'deadly force . . . may be used only to repel an attack which is in itself deadly' "].)  Thus, a defendant who acts defensively but " 'the force used exceeded that which was reasonably necessary to repel the attack' " is guilty of murder or attempted murder (*People v. Hardin, supra*, at p. 630), or is guilty of the reduced offense of voluntary manslaughter or attempted voluntary manslaughter if the defendant honestly thought the excessive force was necessary (*People v. Mayfield* (1997) 14 Cal.4th 668, 777-778).

In reviewing a challenge to the sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Avila, supra*, 46 Cal.4th at p. 701.)  It is the exclusive province of the jury to determine credibility and to resolve evidentiary conflicts and inconsistencies, and we presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence.  (*Ibid*.; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)  If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding.  (*Avila, supra*, at p. 703.)

*Analysis*

Drawing all reasonable inferences in favor of the judgment, the jury could reasonably conclude defendant had the intent to kill Ferraro when he stabbed him in the

9

torso.  As explained by the physicians who testified at trial, a stabbing wound to the flank area can cause life-threatening internal bleeding due to the organs (particularly the kidney) and the major blood vessels located in this part of the body.  The jury could deduce that defendant intended to kill Ferraro because he stabbed him in this vulnerable area.  Indeed, defendant admitted that he aimed for the torso, and he did not aim for a less vulnerable area such as a hand or foot.

Further, the jury was entitled to credit the prosecution witnesses that defendant told his two male companions to hold Ferraro, and to discredit defendant's testimony that he thought the victim was pulling out a weapon.  The request to hold the victim can support an inference that defendant did not merely want to intervene in the fight to break it up or to inflict nonlethal injury, but rather defendant wanted the victim to be in a position that allowed him to use his knife to attack the victim with lethal force.  The jury could deduce that if defendant was motivated solely by a defensive concern or to intervene with nonlethal force, he would not have instructed his companions to hold Ferraro and he would not have aimed the knife at Ferraro's torso.  The jury could also consider that even if defendant initially intervened in the altercation for defensive reasons, his use of a knife in a lethal fashion constituted excessive force in response to a fistfight, particularly given that defendant admittedly saw no blood on his two companions, he saw no weapon in the victim's hands, and the victim was outnumbered three to one.  Considering all these circumstances, the jury could reasonably conclude defendant did not honestly believe he needed to stab the victim in the torso to protect his companions and he acted with unjustified and unmitigated intent to kill.

10

To support his challenge to the jury's finding of intent to kill, defendant points to a variety of evidentiary items, including that the victim started the physical altercation and knocked defendant's two companions to the ground; defendant did not threaten to kill the victim; Vizcarro testified defendant appeared more frightened than angry after the stabbing; defendant testified he was intoxicated; and after the stabbing the victim was able to make a gang sign and yell a gang name. These were relevant matters for the jury to consider, but they do not defeat the sufficiency of the evidence to support intent to kill.

To support his challenge to the jury's finding of intent to kill, defendant also contends he did not inflict a life-threatening type of injury on the victim. No such injury is required to establish intent to kill. (See *People v. Avila, supra*, 46 Cal.4th at p. 702 ["degree of the resulting injury is not dispositive of defendant's intent"].) In any event, the physicians' testimony about defendant's internal bleeding supports a contrary conclusion.

The record supports the finding of intent to kill required for attempted murder.

DISPOSITION

The judgment is affirmed.

HALLER, Acting P. J.

WE CONCUR:


McDONALD, J.


IRION, J.

11